## Rhoads v. Central Taxicab and Transfer Company.

*E. H. Deysher*, for plaintiff and rule; *P. H. Reigner*, contra.

SHANAMAN, J., Feb. 4, 1929.—Plaintiff sued defendant for damages for death of plaintiff's husband. In the City of Reading, Fifth Street and Washington Street intersect, Washington Street running east and west, and Fifth Street north and south. The intersection is a busy and contral one, with single trolley traffic straight on both streets, and trolley traffic also from Washington Street turning south into Fifth Street. There are traffic lights with a police officer in charge.

At about 5 P. M. a trolley car was standing on Washington Street west of Fifth Street, at the intersection, taking on and discharging passengers. The conductor had given the signal to proceed, and the motorman was waiting for the traffic lights, which were against him, to change, so that he could proceed east on Washington Street across Fifth Street. At the same time there was a line of automobiles at the intersection on the south side of Washington Street west of Fifth Street, between the trolley car and the south curb of Washington Street. They were standing parallel with and headed in the same direction as the trolley car, and were likewise awaiting the change of lights to permit them to move ahead. Defendant's automobile was the first in the line. The trolley was eight or nine feet west of the crossing for pedestrians, which runs north and south on the west side of Fifth Street, across Washington Street. Defendant's automobile was standing at the traffic line, somewhat back of the front of the trolley car. Behind it in the line was another automobile along the side of the trolley car, and behind that automobile was a third automobile, which stood about five feet back of the trolley car. The police officer changed the signal to green, which was the "Go ahead" signal for the trolley car and the automobiles alongside it. After the signal changed, plaintiff's decedent stepped off the northwest corner curb of Fifth

and Washington Streets down into the street, and started to walk south across Washington Street along the foot-crossing, behind which the trolley car and the three automobiles had been waiting. This fact, which was submitted to the jury for determination, appears, however, to have been absolutely established by the testimony of the motorman and the traffic officer, plaintiff's witnesses, and is uncontradicted. Just after the signal changed, the plaintiff's decedent stepped off the curb. As he did so, the motorman gave two taps of his bell and started the car. The three automobiles also started, all four vehicles rolling forward toward the crossing at the rate of three to five miles an hour. Decedent, without looking right or left, and without looking at the trolley car, but looking straight ahead, kept walking on, and the trolley car had gone about six feet, and was about two feet from the crossing, when the motorman, seeing that the decedent was stepping on to the track in front of the moving trolley car, and still without looking at it, tapped his bell again and stopped his car. Then, for the first time, decedent appeared to notice the trolley car; he glanced at it, quickened his step, hurried across the track, stepped into the portion of the street south of the track and started to cross it. This all happened very quickly, and in the same space of time the line of automobiles had been moving with the trolley car toward the crossing. Defendant's automobile was about even with the front of the trolley car, or a little behind it, and when the trolley car suddenly stopped, and decedent took several steps in front of defendant's automobile, it struck him. Defendant's automobile, after striking decedent, halted within about its own length and stopped upon the crossing, with its front end about at the western curbline of Fifth Street. The trolley car was still motionless. Defendant's automobile was running at the time about a foot south of the trolley car. There was no traffic moving west on Washington Street at the time. The facts above set forth were the plaintiff's case. Defendant moved for a compulsory non-suit, which the court refused. The case was submitted to the jury, who found for the defendant. Plaintiff has taken a rule for a new trial.

"From the mere happening of an accident, no presumption of negligence arises, and drivers are not to be held liable where their only proven fault is inability to avoid a collision, under circumstances which are unusual and not likely to be anticipated. Negligence cannot be imputed because of the failure to perform a duty so suddenly and unexpectedly arising that there is no opportunity to apprehend the situation and act according to the exigency:" Bloom v. Bailey, 292 Pa. 348, 353.

In the present case the motorman, it is true, stopped in time to avoid the decedent, but he saw the pedestrian approaching at a walk across Washington Street. Defendant's driver could not, and did not, see the pedestrian till he, with hurried steps, appeared in his path, and did stop within the car's length. "While a chauffeur at public crossings must have his car under such control as to be able to stop on the shortest possible notice, he is not required to drive so he can stop instantly:" Twinn v. Noble, 270 Pa. 500, 503. In the case of McAteer v. Highland Coffee Co., 291 Pa. 32, there was a parked automobile to defendant's right, against the curb, and extending ten feet into the roadway. Defendant drove along on the right side of the street as plaintiff started to cross the street from defendant's right to defendant's left, over a paved footway. The decedent in that case ran out from the back of the standing automobile, at the same time adjusting his coat with his right hand and, without stopping, stepped into the track of the approaching automobile, which hit him. The driver of the defendant company saw him first when he appeared from in back of the parked automobile. There was no evidence as to whether

the decedent in that case looked, or did not look, for traffic. The driver stopped within a few feet. The Supreme Court sustained a refusal to take off a non-suit. The only difference between that case and the present case is that in the present case the decedent may have taken a step or two more than in that case before being hit. The present case, however, is not one in which the defendant was 100 or more feet away at a time when he could have seen the decedent. The testimony is, in fact, that he was only a few feet back of the front of the trolley car when he started. If, however closely decided, the present case was for the jury on the question of defendant's negligence, and this is not free from grave doubt, we are, nevertheless, of opinion that the defendant was entitled to a compulsory non-suit on the ground of decedent's contributory negligence.

It will be observed that decedent stepped into a street (Washington Street), which had just been thrown open by the traffic officer in charge thereof for east and west traffic, and in the face of a contrary signal started to cross from north to south, entirely ignoring the two taps of the motorman's bell, which constitute a loud and easily audible warning; ignoring, also, the very forward movement of the car itself, and looking neither to the right nor to the left, he continued across, and actually thrust his body into the path of contrary-moving traffic, to wit, the trolley car, at a time when the moving car, still in motion, was within two feet of his path. No vehicle meanwhile was coming west on the north side of Washington Street, and he could readily have halted or could have retraced his steps to the north curb. As he set foot upon the trolley track, the motorman again tapped his bell and suddenly stopped the car. Decedent then, for the first time, appeared to notice the car, and, quickening his step, hurried across the track. He could certainly have stayed in front of the car till the signal again changed. He could have stepped at least partly off the track and, we think, in all probability, entirely off it and allowed the automobiles, which were all in motion and almost upon him, to pass before he completed his journey. Instead, he hurriedly stepped from in front of the trolley car and thrust his body in front of a stream of moving traffic which was almost upon him. The evidence is clear that he did not look prior to the time when he was nearly run down by the trolley car, and recklessly had thrust himself into that manifest imminent danger. The evidence is indisputable that he was saved then, not even by the motorman's last signal, or by any care exercised by the decedent himself, but by the motorman's being able to stop his car. The case is not one wherein the pedestrian, walking in obedience to signal on a foot-crossing, observes a car approaching the foot-crossing on the near side to it and continues his journey in the face of the closely approaching vehicle. In such case, the pedestrian, having the signal, knows that cars approaching without the signal commonly draw close to the foot-crossing and there halt, and he is not bound to expect that he is in any danger from such approaching car: Wack v. P. R. T. Co., 93 Pa. Superior Ct. 206, 208.

In the case of Anderson v. Wood, 264 Pa. 98, the court said, at page 101: "It was not necessary for the appellee to show that Anderson, who is now dead, looked from right to left after he left the sidewalk. She is entitled to the presumption that deceased did that which a prudent man would do under the circumstances, and that he continued to do so until the accident took place. Having, without fault on his part, committed himself to the act of crossing, it became the duty of appellant to so control his car as to do no injury to the pedestrian, who was on the cartway a sufficient length of time to be seen, the driver of the car being far enough away to bring his machine

under control. This the driver did not do, and his neglect caused the accident." But in that case, "when Anderson, the man who was injured, was seen in the cartway, the appellant's automobile was more than 100 feet away from him, approaching on the side of the street Anderson was then crossing. No machine or vehicle was between the driver of the car and the pedestrian; each had an unobstructed view:" Id., 100. Thus, too, in the case of Fish v. Stulb, 274 Pa. 87, where the court held the question of contributory negligence to be for the jury, defendant's car was 115 feet away when plaintiff started to cross ten or eleven feet of roadway.

In the present case, the view of defendant's automobile and of the pedestrian was obstructed by the trolley car. Defendant's automobile was not more than fifteen feet from the crossing before it started, and was almost even with the trolley car when the trolley car stopped. Nor is there room here for the presumption that decedent was "without fault on his part," in the face of plaintiff's evidence that he was at fault. While there is no positive testimony that he looked, or did not look, after leaving the car tracks, there can be no favorable presumption in his case such as existed in the case of Anderson v. Wood, supra, because of the established fact that he negligently walked into the path of the approaching trolley car, and then quickened his step and hurried across. Decedent, therefore, is not within the rule of Twinn v. Noble, supra, 503, that "where . . . a pedestrian, without negligence on his part, has committed himself to the crossing, he has the superior right of way as against a vehicle thereafter approaching." Decedent is rather in the position of the plaintiff in the case of Weaver v. Pickering, 279 Pa. 214, who "seemed oblivious to danger, and chose to walk by faith across a busy city street; in so doing, he assumed the risk:" Id., 216. "People are not entitled to walk the streets with closed eyes and inattentive minds. Even on a city street a man must heed what he is doing and where he is going, or he cannot complain of the consequences. This is the rule even on the sidewalk (Robb v. Connellsville Borough, 137 Pa. 42), and when he steps into the cartway, he is equally bound to remember that horses and vehicles have also a right of way there, to which he must give due attention, or he will be barred of complaint as to the consequences:" Id., 216. "The rights of pedestrians and vehicles at public crossings are equal; each must exercise care according to the circumstances. True, more care is required of pedestrians between crossings and of automobiles at crossings; yet each must observe ordinary care at all times:" Twinn v. Noble, supra, 503.

If it could be assumed that decedent did look before leaving the car tracks, he tested a known and imminent danger by hurrying across a stream of moving traffic within a few feet of him, when he could with entire safety have stood in front of the trolley car. "Where a person assumes a position of danger when there is another safe place to which he may go, and by reason of this position is injured, ordinarily there can be no recovery against another who may be negligent," the injured person's position in itself being a contributing cause: Robinson v. American Ice Co., 292 Pa. 366, 369.

Though we are of opinion that defendant was entitled to a compulsory judgment of non-suit, we have considered plaintiff's reasons for a new trial. Plaintiff presses but one point, namely, that the court erred in charging: "You will understand that, even though the plaintiff's decedent was lawfully on that crossing, he was bound to use his eyes and senses and keep a sharp lookout for danger and traffic when crossing a busy city street intersection such as Fifth and Washington Streets, in the City of Reading." This portion of the charge must be read in connection with its immediate context (Corne-

lius *v.* Central Acc. Ins. Co., 218 Pa. 532; Ludwig Piano Co. *v.* Browne, 33 Pa. Superior Ct. 81), and the whole charge in a trial by jury must be considered with reference to the issuable facts given in evidence at that trial: 38 Cyc., 1621. The court immediately followed that portion of the charge with the following language: "If you find that he went across the crossing in a careless and negligent way, not having a proper regard for traffic conditions about him, and that such negligence on his part contributed to the happening of this accident, then you would be entitled to find him guilty of contributory negligence, and he could not recover damages." The court also had already said that "negligence is defined in the law as the absence or want of due care under the circumstances; it is the doing of something which a reasonably prudent man would not have done under the circumstances, or it is the failure to do something which a reasonably prudent and careful man would have done under the circumstances," and had also said: "And if, while he has that signal to go, the pedestrian steps down on to that crossing, he is then out in the street where the vehicles travel, and he is lawfully there, he is lawfully on that crossing, and he has a right to proceed with due care under the circumstances to cross that street and get out of the danger which one is in when one is on a street. If the signal changes while he is crossing the street, he is still lawfully on the crossing; he still has the right, using due care under the circumstances, to proceed to get off that street by crossing, if he can with due care accomplish the crossing." The charge, however, even the objected portion thereof, appears to us to have been a proper statement of the duties of the pedestrian under the circumstances of this case. In Mooney *v.* Kinder, 271 Pa. 485, the court said that "in making the crossing, she had to be observant, not only of traffic on Graeme Street, but, in addition, of that coming into Graeme Street from three other directions:" Id., 487; and also said: "Plaintiff's observation could not be confined alone to the street on which defendant was approaching—she was bound to take account of traffic coming three other ways:" Id., 488. In Mantia *v.* Pearlman, 91 Pa. Superior Ct. 478, the court said, at page 482: "They (two pedestrians) had to be on the lookout for traffic in six directions . . . and also had to be observant of traffic from Liberty Avenue. . . . The plaintiff could not, therefore, devote her attention exclusively to the traffic in any one direction; she was required to be watchful of the traffic moving in other directions as well." If a pedestrian "has to be observant," if he "is required to be watchful," if he "has to be on the lookout," these phrases necessarily imply "the use of his eyes and senses." A jury is in fact more likely to comprehend the concrete than the abstract terms, and it should be observed that the Supreme Court, in the case of Weaver *v.* Pickering, *supra,* spoke of "closed eyes and inattentive minds," and used the phrase "must heed what he is doing and where he is going," and also spoke of "due attention." The use of the word "sharp" by the court was in no way the equivalent of saying "a high degree of care," much less of saying "a very high degree of care," and in no way departed from the standard of "reasonable care under the circumstances," as previously charged by the court. The word "sharp" was at least legitimate under the circumstances of the case, as hereinabove at length described. "Regard must be had to the *locus* of the accident and to the condition of traffic at that point:" Mantia *v.* Pearlman, *supra,* 481. "It was his duty to look for approaching vehicles and otherwise exercise such care for his personal safety as the situation demanded:" Fish *v.* Stulb, *supra,* 90. "We believe, however, for the reasons hereinbefore suggested—though the matter is wholly foreign to the present case—that justice would be better administered, and incidentally a better

652

citizenship result, if juries were specifically told what were the duties and liabilities of the parties, without laying stress on the words 'great,' 'ordinary' or 'slight,' at the same time telling them why the law is so:" Cody *v.* Venzie, 263 Pa. 541, 546.

Nor does a consultation of the dictionary lead to any other conclusion. The New Century Dictionary (1927) defines "watchful" as "vigilant, or alert; closely observant." It defines "look-out" as "the act of looking out, a watch kept, as for something that may come." It defines "sharp" as "vigilant or attentive." There is no difference between saying that a pedestrian must be "closely observant," or "alert," or "watchful," and saying that he must keep an "attentive" or a "sharp" look-out. These phrases are all synonymous, substantially identical in meaning. While each possesses, from a literary point of view, its own subtle flavor, which may recommend it to the stylist for preference in a particular passage, no one of them more than any other, and none of them at all, would convey to a jury that there was a legal requirement of very great care, over and beyond the reasonable care demanded in fact by the circumstances of the case. "Nor do we understand or believe that the jury" so understood it: Com. *v.* Fink, 93 Pa. Superior Ct. 57, 60. The verdict was for defendant, and we have no motion for judgment *n. o. v.* Ruling, therefore, simply upon the motion before us, we are of opinion that neither the weight of the evidence nor the charge of the court warrants a retrial.

And now, to wit, Feb. 4, 1929, plaintiff's rule for a new trial is discharged.

From Charles K. Derr, Reading, Pa.